## RADDING v. NINTH FEDERAL SAVINGS & LOAN ASS'N. OF NEW YORK CITY.

District Court, S. D. New York.

March 31, 1944.

Levine & Meckler, of New York City (Sidney S. Levine, of New York City, of counsel), for plaintiff.

Harry Nassberg, of New York City, for defendant.

CAFFEY, District Judge.

What I shall say will be comparatively short.

We have been in the present trial five days. After the completion of my opinion I have other work to do in this case. Two decisions of the Circuit Court of Appeals have indicated to district judges that it is better that the trial judge draw the findings, rather than that they be prepared by counsel in the first instance.

The pleadings are extensive. I shall have difficulty in completing the findings prior to going into the motion part next Monday. On this account I shall not undertake to discuss every phase of the trial or to go over all contentions of counsel. If I am to be ready for the motion work it is essential that today I be brief.

This lawsuit relates to a soldier of the United States. Naturally all of us honor men at the front and appreciate the service they are rendering to our country. That feeling, however, cannot properly influence a court's decision. Judges are bound by their oaths to decide cases as best they can under the law as it actually exists. So, we are forced to disregard sentiment and to treat the controversy on its merits under the law as we construe it.

There are two actions with which we are concerned in the instant trial. One is a mortgage foreclosure which has been carried to conclusion in a state court. In the other, now pending in this court, the plaintiff seeks a stay of further proceedings in the state court or an order or judgment setting aside the state court foreclosure sale in event it has taken place.

The mortgage was given by the Parkway West Corporation. It was executed in 1939 (Exhibit 15) and ran to the defendant in this case.

The premises covered by the mortgage were leased to the N. A. C. Corporation in 1938, effective in 1939, and to run for ten years; that is, until 1948 (Exhibit 7). The rent was on an increasing scale in monthly installments of $625 for the first five years, $708.33 for the next three years and $791.67 during the last two years.

There was also an assignment of rents by the mortgagor to the mortgagee dated February 2, 1942 (Exhibit 1).

In the state court there was and in this court there is involved a statute that is of crucial and, at least in some of its aspects, is of governing effect. This is the Federal Soldiers' and Sailors' Civil Relief Act. It was passed in 1940 and amended in 1942. It is to be found in Title 50 of the United States Code Annotated, Appendix, Sections 501 to 590. For convenience I shall refer to it as the Act.

Because of the shifting of litigants in the two cases from one side to the other there is danger of confusion in our discussion. On that account I shall hereafter refer to those with whom we deal mostly by description rather than by individual names. The plaintiff in this suit will be called the soldier. The Parkway West Corporation will be called the mortgagor. The defendant herein will be called the mortgagee. The N. A. C. Corporation will be called the tenant.

On the same day, to wit: March 25, 1942, two things of importance occurred. The first was a conveyance of the mortgaged property by the mortgagor to the soldier. The second was induction of the soldier into the military service of the United States.

Primarily the Act was designed for the protection and benefit of soldiers and sailors. For the purpose of present consideration, but without definitely so deciding, I shall assume that on March 25, 1942, the soldier succeeded the mortgagor in the ownership of the property covered by the mortgage. So also for the purpose of discussion, but without so deciding, I shall assume that at the time the property was transferred the soldier owned all the stock of the mortgagor.

Out of what I have described there arise several issues. Three are of major significance. I shall take up those three in order.

As indicated at the beginning this afternoon, I shall not try to cover everything counsel have debated. Indeed, as I see it, a good many of the things said will not contribute to the determination of the dispute. Accordingly—at least for the most part—I shall limit myself to the major issues because, as I conceive and as I shall endeavor to point out, they control disposition of the case.

The first issue divides itself into two branches. The first inquiry under that issue is this:

Was the ability of the soldier to comply with the terms of the mortgage materially affected by reason of his military service?

If the answer to that question be yes, then, if this were an original litigation and there had been no state court proceeding, as matters stand, the soldier would be entitled to relief. On the other hand, if the answer to that question be no, then the soldier is not entitled to the relief he asks.

Under the phraseology of the Act the answer to the inquiry must be in the form of an opinion by the court that is considering the matter. I feel compelled by the proof to express the opinion that the answer is no.

I think there is one reason for this answer which is conclusive. In the circumstances, including the pressure on my time, I deem it enough to explain what I believe to be that reason.

On February 2, 1942, which preceded the date of transfer of the property and of the induction (both of which, as I have said, took place the same day) the mortgagor made an assignment of the rents to the mortgagee (Exhibit 1). The rental income to pass under the assignment was $625 a month. The monthly installments payable to the mortgagee was $612.02. Later, in December, 1943, the monthly amount payable to the mortgagee was increased to $708.33. All I have stated about payments of installments, of course, preceded the maturity of the mortgage debt.

Lest the situation be misunderstood let me repeat: The rental income to the mortgagor from the tenant, the N. A. C. Corporation, was $625 a month. The installment payable to the mortgagee monthly was $612.02. If, therefore, we deal only with the two figures (that is, the rental income from the tenant and the monthly installments which were to be paid to the mortgagee), it will be seen that monthly there would be an excess of approximately $13 a month of the rental income over the monthly payments of installments to the mortgagee.

A minor feature, as I understood the testimony, is also that there was a small store which brought in to the mortgagor an additional income from rents of $720 a year or $60 a month. Thus the total from rents left in the hands of the mortgagor after paying the installment due the mortgagee would be increased to $73 a month. This, however, is a petty matter and we need give it no further attention.

Yesterday I examined a letter dated February 2, 1942, dealing with the grace period for making payments to the mortgagee (annexed to Exhibit 1). Under the terms of the mortgage itself the grace period was 30 days. Counsel disagree as to the interpretation of the letter. However, I need not determine the difference between them. I shall assume that the

letter increased the grace period by 15 days and that, therefore, there was a total grace period of 45 days.

There has been considerable discussion about payments having been made within the 45 days and, as is argued, defaults thereby being avoided. But, as is obvious from going over the figures with care, from December, 1941, relating to the November 1 installment, down to a time when at any stage there were no further payments on installments, there was not a single instance in which the period between the due date of the installment and its actual payment did not exceed 45 days. There is no exception. The failures continued down to the foreclosure action; and, so far as concerns the installments due June 1 and July 1, 1942, not only were they not paid seasonably but neither default on those installments has ever been made good in whole or in part. So that indisputably the evidence establishes that there were at least two complete defaults on the mortgage before the foreclosure suit was commenced against the soldier in the state court.

From the uncontroverted facts I see no conclusion to be drawn except that, with plenty of money to meet all the installments coming in from the tenant, there was a diversion of those funds or part thereof from the purpose to which they were obligated by reason of the mortgage and the assignment of rents. So also there is no escape from the inference that the diversion of the income was at the instance of the soldier.

To put it otherwise, if he had refrained from diversion or causing diversion there was ample income to pay the installments as they fell due. By the terms of his own obligations or the obligations of corporations he dominated, sufficient moneys had been specifically assigned to discharge the monthly installments under the mortgage as they matured. Manifestly he is not entitled to relief if the fact be, as I find it to be, that he withdrew the funds or caused them to be withdrawn from the use to which by contract they had been definitively bound. It was thus by his own acts that the mortgagor was deprived of the pledged moneys with which to make payment of the monthly installments. It was he who prevented the mortgagee from being paid.

If I be right about the facts as just recited, the answer of no to the first inquiry is clearly correct and there is no ground whatever on which I could do otherwise than to dismiss the complaint on the merits.

So far I have been dealing with the question as if the matter had been presented to me originally; that is, had come before me prior to the institution of the foreclosure action and there had been no other litigation than that in this court. If what I have said be right, then it constitutes an obstacle which cannot be overcome by the soldier in this lawsuit.

The second branch of the first issue raises this question:

Did the soldier acquire his interest in the property with intent to delay the just enforcement of the mortgagee's rights by taking advantage of the Act?

As I have said before, the conveyance of the property to the soldier and his induction into the military service took place the same day. That was March 25, 1942. I do not bother about which of the two incidents came first. I am trying to get away from small matters and to handle the case on its merits, as I see the proof and the law.

Preceding the conveyance of March 25, 1942, title to the property was vested in the mortgagor (Parkway West Corporation). How can anybody escape the conclusion that the intent and purpose of the conveyance were the identical things embraced in the question I have asked? How can anyone doubt that the intention and purpose of the soldier were, by the transfer that day, to get himself in regard to the property within the protection of the Act? As I feel, the proof renders the conclusion unavoidable.

Let us, however, briefly review the evidence and put the situation on the broadest ground.

The soldier had a full hearing before the official referee,—to whom the matter was sent,—with respect to the above-stated questions arising under the Act. He testified before that official in the foreclosure suit. The state court supplied him with counsel until he changed to his own choice. His testimony has been read in evidence at this trial. Two witnesses have taken the stand and testified in his behalf. One is his brother-in-law and the other is his father. Ever since the mortgagor was incorporated in 1936 the brother-in-law has been associated with the soldier in regard

to the affairs of that corporation. From its inception to date the brother-in-law has been and still is the president of the mortgagor. The soldier, his father and the brother-in-law lived in the brother-in-law's house.

For the moment let us disregard what the soldier said when he appeared on the stand before the official referee. What about the testimony of these other two witnesses?

I am not going to comment harshly on either. I dislike criticizing witnesses unless I be convinced that they have intentionally testified falsely. Here there is no occasion to go further than to mention a few aspects of what they said, without resort to graver accusations.

The father was very biased. He was full of feeling and branched off into denunciation of other people that was wholly unjustified. So far as the evidence discloses, and as I believe, there was no basis whatever for his adverse comment on the officials of the mortgagee. In the absence of adequate proof there was no excuse whatever for his disparaging remark.

I am not going into other phases of his testimony. It is enough to say that I feel that I cannot rely on what he says.

The brother-in-law is a lawyer. He testified quite fully. Then toward the end he conceded that in large part what he had said was based on hearsay. I need not go further with respect to him. It is sufficient to say that, predicated on his own statement, I think I should not give substantial weight to his testimony.

The testimony adduced to support the soldier was much colored. Despite affidavits to the contrary, no stock of the mortgagor was ever issued. The story about the stock seems to me fantastic.

I refrain from going further. I see no occasion to comment at all on the soldier as a witness nor do I discuss the other witnesses in greater detail. Nevertheless, I should add that I have taken account of the credibility of the testimony coming from all the witnesses.

I do not denounce any witness as having intentionally made false statements. It is a frequent experience that witnesses form theories as to what has happened and then swear up to those theories. They are wishful-thinkers. Generally their testimony can be given no greater weight than that of those who intentionally swore falsely.

■ Summarily I put the case this way: I feel that the evidence demands that I reject the contentions of the soldier with respect to matters covered by the second inquiry under the first issue. I am convinced that, in causing the transfer to himself of an interest in the mortgaged property on the eve of leaving home for military service, his intention was to gain the advantage of a stay under the Act and thus to postpone or circumvent a foreclosure; although by that plan the mortgagee were not deprived of its absolute right to foreclose.

Up to this time with respect to this first question under the first issue of the case I have said nothing about the burden of proof,—whether it is on the soldier or whether it is on the mortgagee. But this phase of the litigation should be mentioned.

There are provisions in four sections of the Act that have to do with stays. All are introduced by the word "unless." These parts of the Act might very well be referred to as the unless clauses.

Those four sections of the Act contain the unless clauses. They are as follows: Section 201, 50 U.S.C.A.Appendix, § 521, dealing with stays of proceedings; Section 203(a), being Section 523(a) of Title 50 of the United States Code Annotated, Appendix, dealing with stays of execution of a judgment or order; Section 302(2), 50 U.S.C.A.Appendix, § 532(2), dealing with stays of enforcement of a mortgage on a soldier's property; and Section 700 (1), 50 U.S.C.A.Appendix, § 590(1), dealing with when the court can give relief under the 1942 amendment of the Act.

The transactions involved were particularly within the knowledge of the soldier. My impression is, I may even say my strong feeling is—though there is no occasion definitely to decide the matter —that, under the circumstances, the law places the burden of proof on the soldier. Cf. Boone v. Lightner, 319 U.S. 561, 569–571, 63 S.Ct. 1223, 87 L.Ed. 1587.

If the burden be on the soldier (the plaintiff in this case) with respect to the statutory provision heretofore first referred to,—namely, on the question of whether the soldier was materially affected by reason of his military service,—then certainly on the first question under the first issue the soldier has not, by evidence, made out his case.

However, as I have already indicated, I do not put my decision on that ground. I have taken up and determined the first question as if the burden were on the mortgagee (the defendant).

The second branch of this case relates to the state court foreclosure suit.

By the terms of the Act the state court had jurisdiction co-ordinate with the jurisdiction of the federal court of the questions I have referred to arising in the forecolsure suit with respect to the provisions of the Act.

In the Act there are several sections which include clauses which confer jurisdiction on the state court. Among these are Section 101(4) and 102(2), 50 U.S.C.A. Appendix, §§ 511(4) and 512(2).

■ There is no need for court decisions to establish that the Act conferred jurisdiction on the state courts. The language employed is too plain to admit of doubt. However, it is so held in Boone v. Lightner, 319 U.S. 561, 63 S.Ct. 1223, 87 L.Ed. 1587 (second sentence of the first paragraph of the opinion).

■ No right or jurisdiction was vested by the Act in federal district courts to vacate or impede an order or judgment of a state court or to interfere with the exercise by a state court of the jurisdiction conferred on it by the Act. Particularly under the war clauses—although it is true also under other provisions—of the Constitution, I think it clear that the Congress has ample power to confer authority on state courts with respect to many matters and certainly with respect to those embraced in the Act now under consideration. Statutes along the same line were enacted during the Civil War and during the first World War. According to my recollection they stood up. At any rate I am confident that, if assailed on appeal, the present Act will be sustained.

This court is wholly devoid of appellate power over a state court with respect to questions arising under the Act. That is true because the Act, in express terms, confers jurisdiction of such questions on state courts; and it is the Act itself that vests any jurisdiction in regard to the same matters in this court. Of necessity, therefore, the provisions are coordinate.

Not only does the fact just stated deprive this court of any authority to interfere with state courts in the exercise of jurisdiction under the Act, but Section 265 of the United States Judicial Code, 28 U.S.C.A. § 379, expressly prohibits this court from enjoining "proceedings in any court of a State."

The sole remedies for reviewing the action of the New York State Supreme Court are two in number. The first is an appeal to the Appellate Division or the Court of Appeals of the State. The second is a writ of certiorari issued out of the Supreme Court of the United States after exhaustion of remedies afforded by the state courts.

The result is that what happened in the state court foreclosure action is a binding adjudication on the questions under the Act I have discussed this afternoon. This court has no authority whatever to change the decisions. What has happened in the state court proceeding is final so far as concerns federal courts—save only that, after the appellate courts of this state have made their final determination, with its consent on application, the Supreme Court of the United States may take up the matter on certiorari.

■ The foreclosure decree, therefore, is res adjudicata. It must stand unless it be set aside on review in one of the ways pointed out.

Lastly, though not of vital importance, two things have happened in federal courts in regard to a stay in the action now on trial.

■ First, a motion was made in the district court for a stay. Judge Clancy denied it. Counsel have stated that he assigned a reason for the course he took. As I understood, the claim is that he denied the stay because of improper practice. However this may be, I find in the record no evidence of that. I have examined his order, as well as the papers that were before him. So far as I can discover, he unqualifiedly denied the stay. If that be true, then it seems to me that his ruling became the law of this case and binds me. In that connection read Commercial Union of America v. Anglo-South American Bank, 2 Cir., 10 F.2d 937, 938 to 940.

■ Accordingly, after the ruling by Judge Clancy application to the Circuit Court of Appeals for this Circuit for a stay was made. It was denied. The denial was unqualified. Of course, I am

bound by the decisions of that Circuit Court of Appeals.

It has been argued that in some respects the present Act is unconstitutional. I think not. I think the constitutionality of the statute is completely sustained by the decisions of the Supreme Court of the United States. Among the cases so holding, as I recall, are especially those about the time of the first World War, with which I am familiar, but which I am unable to cite offhand and I have not had opportunity to look up since the question of constitutionality was raised in argument this morning.

I know of no ground, and I believe no ground has been stated, which would justify declaring the Soldiers' and Sailors' Act unconstitutional (Cf. Yakus v. United States, 64 S.Ct. 660, at pages 670, 676; Bowles v. Willingham, 64 S.Ct. 641, at pages 647, 648, 649).

The result is that the complaint will be dismissed on the merits, with costs and disbursements to the defendant to be taxed.